I'm sorry, I mispronounced that before when you've been here, I'm pretty consistent on mispronouncing it. Back home when I made a tackle when I was in high school, they said tackle by Michelle. I need to change it to Jones. We're glad to have you here again and look forward to hearing from you. Thank you, Honor. Judge King, may it please the court. My name is Aaron Michael. I am here on behalf of Raymond Allen, who was tried and convicted in the Western District of North Carolina for participating in a drug conspiracy involving crack. Three issues are raised on appeal. I believe that the parties are in agreement as to one of the issues, which is the issue of the retroactive application of the change in law about the statutory minimums applicable to Mr. Allen. Therefore, I would expect that this court will be sending it back for resentencing on that issue. The government agrees with you to go back on that. I believe so, Your Honor. But you rather get the whole thing thrown out by saying there isn't any evidence. Then that would be moot, right? That's correct, Your Honor. And the two issues are one, whether or not there's any connection between the conspiracy alleged and proven as far as I could tell and Mr. Allen's alleged conduct that goes to the sufficiency of the evidence against him of being involved in the conspiracy. And the second issue is this issue of the witnesses that the government used. The benefits that they apparently were receiving in that defense counsel trial was not permitted to fully explore or to explain to the jury, which I believe denied Mr. Allen a fair trial. But the big issue is the nature of the allegation being that there's this conspiracy in the hill in Marion in the mountains of Western North Carolina. Evidence over three days, as the trial judge pointed out, involving that conspiracy in this location, both as to the participants on the hill who were allegedly got their supply from and the people that those people got their supply from. And they had a successful investigation, prosecution, got all those people to plead guilty. And then they go after Mr. Allen on two transactions from May 17th and 18th, 2010, one and a half ounce of alleged crack. And on the next day, two ounces of alleged crack. And the only witnesses to this are the two alleged co-conspirators who testified that these transactions took place. And while one of the witnesses was cooperating at the time with authorities in the investigation and they were taking measures to keep track of what was going on, none of this there is nothing to corroborate what this witness, Miss Anderson, was saying about what she was doing, about what her boyfriend was doing. And so the evidence as to what happened on May 17th and May 18th was weak. And what about the quantity, though, involved on back to back days? It seems to me that that's your weak spot, the fact you have back to back days and that you have a lot of hits of crack cocaine or whatever the term is, individual rocks that were involved in this transaction. How do you get around the fact of the magnitude, even though a few ounces doesn't sound a lot, when you distill it to the terms of crack cocaine transactions, it's a heck of a lot of individual sized amounts. So how do you how do you get beyond that problem? Well, the government argues that as long as you have a quantity that can arguably be considered distribution quantities. Well, you're talking about about a thousand. I mean, I'm not too good on on drug quantities and how many hits. But I thought there was something in this record that talked about this being a thousand. Is that correct or more? I don't recall that testimony on it, but we're talking about many, many sales that can be made from this quantity. Are we not? Well, it could be like ammunition. If people expected to be a drought, they might want to stockpile what they've got. But I think that two and a half ounces of crack in a federal drug conspiracy is probably considered pretty small. And some might say that, well, this is something that is more of a street level type of situation that the Feds might not even get involved with because it doesn't really hasn't gelled into what can be identified as a a business, a conspiracy involving specialization of activities where there are some people work on the street, specific streets, and they've divided up their territories and they've got specific people that supply them. And it's a business when we're talking about two and a half ounces of crack on two days. I'm not sure that would rise based on I've been doing this for 20 over 20 years. Federal drug cases, that's pretty small, your honor. Well, maybe just because they don't target that amount doesn't mean that it isn't a. A distributable or not just distributable, but intended for distribution when you deal in those amounts, just because they go after bigger targets really isn't relevant, is it? Well, I think it's looking at the argument that was made in the trial court about this being an inference piled upon an inference. The one inference being that the size while small, arguably it could be a distribution amount that Mr Folsom could not consume over a period of time. Although I think there's no evidence that he couldn't consume that over the next month or two or or week or two. And he admitted that he did use. But it's the inference on top of an inference. That's relied upon by the government to say that they've proven their conspiracy at the hill. In area. And they've proven or presented evidence that in Nashville on May 17th and 18th, Mr Folsom allegedly bought two and a half ounces of crack from Mr. Allen that they're connected by these inferences, the inference that the quantity itself shows that he was part of their time to prove it by circumstantial evidence. Yes, your honor. You acknowledge that? Yes, your honor. You've been through that before. It's more of a jury question. Once they make a case, if they did, and you say they did, but that but they did. I found it here on page twenty nine. The government says that the court referred to the proof as being that there was over a thousand street level rock. Well, I would argue that even that's not necessarily an amount that will be distributed in the hill. I mean, that's one of the factors that the jury is entitled to take into account as long as they don't just focus in on that fact. And they look at the totality of circumstances and the totality of those circumstances have been reviewed by the court to make sure that there's enough there that the jury isn't being called upon to speculate. About a person's participation in this federal drug conspiracy. And I think that the the inferences that were being used the multiple inferences that were being used here do take the jury into the realm of speculation. Was there an instructional separate of separate conspiracy? No, your honor. Did you ask for one? I don't recall trial counsel asking for a why not separate instructional. And this is a perfect, perfect case to ask for an instructional separate conspiracy. In other words, he's charged with this conspiracy alone, not another. And that's what that's why you have the jury instructional and separate. Yeah, it may be conspiracy as to here because the amounts of consistent with distribution. But there's no evidence. I think what you are in is that he's involved in this 3 tier drug. It seemed to me that that's critical in this case. Well, the government seemed to argue that there were 2 conspiracies and that they could there were 2 conspiracies. I think that was my impression that what they were saying was that that there could be just that conspiracy between Mr. Allen and and Mr. Folsom. And I guess Miss Anderson relating just to that quantity, even if the jury found that he's still be guilty of a conspiracy. You still have the same defense. Well, I think that that argument has problems in terms of. The conspiracy requires 2 people gender to the agreement. And and I think to say that 2 and a half ounces of crack buyer seller relationship is really a conspiracy is kind of pushing it. But the bigger problem is. The allegation in the indictment returned by the grand jury and the defense entitled to have the grand jury decide what that accusation is. Speaks in terms of the conspiracy centered on the hill in Marion, North Carolina. And so I think the bigger problem is the fact that the government was relying upon that conspiracy. And trying to say that this transaction over here was inferentially connected over here because of 1 person. Well, that Mr. Folsom seems to be like the government wants to bite that off and prove try to prove that they can do it might be simpler for trying to do it the other way. Could not have had it so expansive, but they want to try to prove it that way. That was more let you more openings to attack him on. If he comes up here, we have to look at it in the like most favorable. To the verdict, I think the court is called upon to look at all the facts and circumstances, including the arguments made by counsel in. It's closing argument, calling the jury to action. There are some posse type of argument to the jury about taking action and that this is a war on drugs and the war was centered on. Well, you saying that the proper argument they made well, but you aren't raising an improper argument contention on appeal. No, your Honor. Spaceship efficiency of the I think and try and understand how the jury could arrive at its conclusion. I think looking at the totality of the circumstances, both as to the prosecutor screening of jurors that were not willing to go along with the government's witnesses. The shutting down of the defense in terms of exploring the benefits that these witnesses were receiving. And you have to keep in mind these witnesses are not the type of witnesses that appear in civil cases as experts who completed high school, completed college, probably graduate degrees and probably have a clean record. We're talking about people who probably didn't go beyond ninth grade, who didn't go to work after they left the ninth grade, but went into lying, cheating and stealing in order to support the life that they become accustomed to. And for them to use the system, use the federal system to live that life, to hit people on the head with this testimony. I think the jurors should be allowed to hear an explanation of the circumstances, including the defense should be allowed to use expert testimony about how the system works. I mean, the government has used in the past expert testament. I see my time is up. You know, you say some time. Thank you. Appreciate it. Miss Ray. May I please the court? The defendant in this case received a fair trial in the district court in this case. As it stated, there was properly denied the motion for judgment of acquittal because there was substantial evidence that the defendant both knew of and participated in the charged conspiracy. The this court has recognized that even a single transaction that is of sufficient quantity and there is enough to infer a an intent to distribute can support a conspiracy charge. In this case, there was one conspiracy and the defense did not request a multiple conspiracy instruction, but I don't think it would have succeeded even if they had because the single conspiracy was in the hill. Now, Mr. Allen was a supplier to that conspiracy. He was a supplier to the second tier distributor. And although he only supplied on two occasions, he supplied more than a thousand doses. And the testimony that yields that amount is testimony. I believe it's on 524 of the joint appendix that that says basically says in three and a half, three and a half grams, you get 40 rocks. So they just extrapolated from what you get in an eight ball and then multiplied that to 98 grams of crack that Mr. Allen distributed to Mr. Folston. So this was a hill in a spirit of drugs in the hill. You said, yes, sir. What's the evidence that Mr. Allen knew that these drugs were going to be sold in the hill? None at all, your honor. And we don't need that evidence in this court's decisions. Make that very clear in Strickland. This defendant did not need to know the identity where those drugs were going or anything. What he needed to know was that he was dealing with an individual who was going, likely going to distribute those drugs. And Mr. Folston testified that he did distribute those drugs. The only way for the government to be able to get to the ultimate suppliers is to be able to, again, the conspiracy law recognizes this. The government doesn't have to prove that the person at the top knew the people at the bottom or even where the bottom was. And that would be an impossible burden to prove conspiracy if that were required because the very nature as you go up the chain is no knowledge. They don't, you know, that Mr. Allen didn't want to know where his crack was going to be distributed. Why do you think it's necessary to prove conspiracy? Don't you have evidence of distribution? Yes, your honor. We did in this case. And I'm not saying that we had to have it to prove a conspiracy between Mr. Allen and Mr. Folston. We did not. But we charged a conspiracy in the hill. And we proved that conspiracy. And so it was necessary for us to prove. And all I'm suggesting to your honor is this case law in this court that this court has established in Strickland and Burgos and Reed and Banks is that there is only knowledge necessary that you are dealing with one other member of the conspiracy and that there's an intent to distribute. And that you would reason, the jury may infer that. And the government's evidence in this case was very strong. But because Mr. Folston was charged in a separate indictment, which was really sort of neither here or there, but the government in this case proved the entire conspiracy. In order to prove to the jury that not only did Mr. Allen engage in a conspiracy with Mr. Folston, but that was also part of the larger hill conspiracy that was charged in this indictment. The hill is what that area? It's an area in Marion, your honor. So for example, so if you had, hypothetically. Sure. You have a brother-in-law who lives in New York. You live out in San Francisco. He comes out to visit you with your sister. He says, you know, I'm having a party back in New York and inviting a lot of friends in the Hamptons. You know, there's gonna be a lot of people there. And I need to score about an ounce and a half, two ounces and that kind of thing. Clearly enough to have the thousand hits that Judge Keenan asked about of crack, for example. Maybe not the Hamptons since it's crack. Maybe someplace else. But anyway, so then, but it turns out that the brother-in-law really is involved in a conspiracy of drug conspiracy in New York, where a lot of people, so you're saying that really the fact that you sold enough, that was a distributable amount to this person without any knowledge other than the fact that he said, I'm having a big party in New York. You're part of the conspiracy that went on with the brother-in-law in New York. Well, let me say this. The question would be whether it was reasonably inferrable by the jury that the person in California was part of the conspiracy in New York. The defendant could make the argument in that case. But he sold the drugs. Right. And to answer your question directly, Judge Gregory, I think that's enough evidence. The jury could infer that the person in California, and it's not that I think it's enough evidence. This court's case is established. That's enough. But the defendant in that case would have a much stronger argument to make to the jury that the jury shouldn't draw the inference that is permissible. That that defendant was part of the conspiracy because in that case, the defendant would be able to say if the defendant chose, you know, or maybe there was a witness there. Hey, he told me it was part of this party. Now, a party where they were going to distribute a thousand rocks of crack in one party is quite a party. Maybe that wouldn't be believed by the jury. But if it were, the jury might say, you know, this defendant didn't have any knowledge of that conspiracy and didn't plan to participate in it. But at a minimum, the defendant was in conspiracy with his brother-in-law. And that would be proven because the defendant gave a thousand rocks of crack knowing the defendant was going to participate, going to distribute. He didn't have to find it. All of them were involved in it. That's your name in there. They just had to find it. Two or three were. That's right, Your Honor. I mean, under that under that under that conspiracy law, I mean, it is broad. You can you can arguably you can allege that all the people back in Columbia or wherever they made this stuff or brought it started. We're we're part of the conspiracy, too. But maybe they're not. They're unindicted yet or something. Well, sure. And that's sort of the purpose of it. I think if one goes back to why conspiracy law, why Congress drafted a law and why it's been interpreted to to apply that broadly is because there is a reason that the government should be able to prosecute the person in Columbia. Who else do we want? I mean, we want to be able to reach those suppliers. It doesn't help the drug trade in Marion. I'll be as a conspirator with the guy up on the hill. That's right. But they don't know each other. Absolutely not. And there are spokes to conspiracies and all of that. But we don't it doesn't help the community in Marion to take the street level dealers off of the street and not address the suppliers. This was a four tiered conspiracy. The government in this case, I think the investigators, part of why Mr. Allen was charged later was because it took a while to to start at the bottom and get up that far and find out who the other. Well, they charged him with conspiracy. We did. Didn't charge him with any substantive offense. That's correct, your honor. And I've had a conversation. Pardon? I've had a conversation with the prosecutor about whether that made the most sense in this case where you actually have, you know, you have discreet amounts. Hold on the distribution fence. Pardon me, your honor. You had him pretty cold. Oh, yeah. I did have you cold. Right. And we had discreet amounts. And although Mr. Michael says this is a lot, this isn't a lot. Well, it's still a thousand rocks. And I know that the conspirators in this case were held responsible. Some of them, Mr. Wilkerson, Martinez, Wilkerson, for example, was held responsible for an amount of between one point five and four and a half kilograms. So the quantity actually the defendant benefited by in terms of the government held him only responsible for the amount of drugs that he actually transacted. And the part of that recognition is the law that he was even under conspiracy law, only responsible for what was reasonably foreseeable. The government didn't overreach in this case. The government didn't try to hold him responsible for everything that Mr. Folsten distributed because we really recognized in this case that these were two discreet transactions. But they were, in fact, part of the broader conspiracy that took drugs from Buncombe County in Asheville to Marion. And that how far is Marion? It's about a half hour. In fact, actually, I always know exactly when I'm a half hour from home, because I live in Asheville, when I hit exit 86, which is Marion. So it's on I-40? It's on I-40. It's right off I-40. That's right. So the it's a half hour away. They go down. And actually, Mr. Folsten lived in Old Fort, which was between Marion and Asheville. And so sort of right down I-40, you hit Old Fort right before you go down what we call Old Fort or up. If you're coming from Old Fort to Asheville, the Old Fort grade. So in this case, the evidence actually of the conspiracy in his participation in this one conspiracy was strong. The government acknowledges that it was only two transactions. But I note that they were on consecutive days. It wasn't though it was only one transaction. One transaction would have been enough under this court's case law. But here we had two. And the first one contemplated the second because it turned out that he was short. And the defendant said, well, the next time you need it, you know, we'll I'll make it up to you. That next day happened to be that the day that he made it up to him. So he knew that it was being distributed. Mr. Folsten testified that it was distributed. If your honors don't have any further questions about the sufficiency of the evidence as to the conspiracy, I guess the only thing I would note about the fair trial issues is that the defendant in this case was given ample leeway and did, in fact, cross-examine carefully and vigorously on the questions of the benefits that the government witnesses gained in this case. Government witnesses were actually quite candid. Mr. Folsten was very candid. And Ms. Anderson was never prosecuted. And so all that dispute about PSRs or thirty five fifty three E's five K's didn't apply to her at all. But he says, you know, you won't give him the PSRs. It could be good information for him in his PSR. There could be, your honor. But the information in those PSRs is confidential and the court strictly protects that confidentiality. Well, if it helped get a fair trial, he ought to have that kind of material, I would think, wouldn't he? Well, I would suggest this, that he got that kind of stuff in the PSR that he that he doesn't have otherwise. I mean, inconsistent statements. What if he told the probation officer a different story than he than he told on the on the on the stand? Well, your honor, that would suggest that they could just go on a fishing expedition. There's no evidence in this case that there was an inconsistent statement. Well, they wouldn't know whether there's any evidence that somebody looked at the PSR and certified to the judge or gave it to the judge to look at. And and you made a record that there's nothing in this PSR that's impeaching or Brady material or exculpatory or anything that wasn't done, was it? Absolutely not. And this court's decision in Trevino. I do that. Well, it looks to me like I've got to be the way things are operating. Well, I would respectfully suggest that then disagree with you on the conspiracy law. But I I'm I'm kind of in favor of giving the defendants a fair shot at these witnesses. Well, I think that if that's if that's the court's perspective, the court has to undo Trevino. And and that would be quite the burden on on the district courts to review every single the burden on that. The burden on the district court and the prosecutor to give the defendant a fair trial. That's not a burden. That's your obligation. Agreed, your honor. Absolutely agreed. However, the defendant in this case, there has to be a burden on the defendant to at least know or have some idea that there is something in that PSR. That PSR says no. What the criminal record of these co-conspirators that you're putting on the witness stand might be when he's never met him. And you say he had never met him and you couldn't prove he'd ever met him. He didn't have to know under the law. He doesn't have to know who these co-conspirators are. His own co-conspirators doesn't have to know. But he ought to know enough to be able to have a fair shot at cross-examining them and impeaching their credibility. And he did. He knew. He asked. We don't know what's in the PSR. What we do, we don't know whether he had all the felony convictions that they had. In terms. Every one of those could be impeaching. In terms that he did have the record. He does know the defendants, what the defendants stood to gain. He was at, they were asked very specifically what they had to gain by testifying. And he was allowed extensive. He knew what their deal was. You gave him the plea agreement. Is that what you did? Yeah, I don't. Yeah, the plea agreement. Well, he was asked about it. You know what? He doesn't know what he told the probation officer, whether they told the probation officer an inconsistent story. That would be impeaching. Right. But he also doesn't know whether whether he has all the information as to their prior convictions. Does he? Or does he? I think he does know that I certified that he had all the prior convictions of the witnesses. They all got felony convictions. So you got to turn those over. Right? I mean, he knows the prior convictions. He knows the plea agreement. He's asked. He's allowed to ask about that extensively. And the only thing that your honor has mentioned that maybe he doesn't know about is whether there was an inconsistent statement to the probation office. But it's just a statement. You ought to be entitled to it. Perhaps your honor. But this court's case in Trevino requires that the defendant have some burden because the the policy decision was that he doesn't know anything. How's he? How's he going to carry the burden? Let me let me respond this way. Your honor burdens shifts over to you all to give him a fair trial. Right? But part of the reason in a couple of things. First of all, the decision has been made right or wrong as a policy matter. And this court's decision in Trevino recognizes this that precedence reports contain a lot of private information. Part of which, by the way, is conspirator co-conspirators and cooperators that could be very dangerous in the hands of defendants. That's why they're not always allowed access themselves, like to take him to prison, for example. But what matters in this case is they had discovery. If that defendant, hey, that witness had given inconsistent statements to anybody but the probation officer, they knew it. They had all of that. That's the point. If he gave an inconsistent statement to anybody, but they had it right. But what if he gave one to the probation officer? You're saying he wouldn't get it. I might be the statement that turns the whole case. Well, theoretically, I granted new trials where the where they've turned up with the prior consistent statements that that should have been turned over and weren't. Well, of course, but I'm not sure that this corpus case, you're absolutely. But I'm not sure that any of those were overturned because of a statement to a probation officer in preparation for a precedence report. Those are inconsistent statements that were given after the crime, you know, to they were never turned over because government counsel and prosecutors or agents didn't do their constitutional duty to turn them over. There is no constitutional duty to turn over a precedence report of a witness, and it is dangerous to do so. In some cases, it can put people's lives in danger. Or I'm talking about what's in it. That might be helpful to the defendant. If that might be rating material, basically, or or impeaching material. If there is material, the government has has impeachment information. It has to be supposed to provide it. Sure. The defendant. That's what the Supreme Court said under Brady versus Maryland. And it's and Jenks would be the case that requires that we turn over impeachment evidence. Absolutely. So if the government knew that the defendant had given up, given a statement to the probation officer that was inconsistent, it would have a duty that that the exception to all that is present. Report that the person if there's Brady material in a precinct report, you don't have to turn it over because the Torino case says so. Your honor, I'm not suggesting that. First of all, there's no evidence in this case that there was Jinks material in any pre sentence report of any of these witnesses. The government is no evidence in it because nobody knows what's in them. No, the government does. And presumably the government would have certified of the court that there wasn't anything in it. That I haven't read every single one of his witnesses. Precedence reports. I cannot certify that to this court. But I will assume that had there been an inconsistent statement given by one of these testifying witnesses, it would have been turned over to the defendant. And the defendant hasn't suggested otherwise. But but and I agree with your honor that these are these are sealed. The defendants don't have access to them. But what they did have access to, they were very ably able to make use of in this trial. And that was a lot. But there were there was really only one witness in this case to if you consider Nicholas Wilkerson, who was the witness that testified in the jail that he had a conversation with defendant. It was a little incriminating, but the only witness was Wilkerson that had a pre sentence report Anderson. And this whole case could have risen and fallen on Anderson. And we could have relied put her on the stand only. And we could have succeeded in proving Mr. Allen's connection to this conspiracy. And she didn't have a pre sentence report because she wasn't prosecuted. And the defendant suggests that he didn't have the opportunity to ask about that. But that's flat wrong, right? Read if the trade, the honor, the court were to review Ms. Anderson's cross examination. She was asked several times whether she was prosecuted. The only objection was sustained as asked and answered. It was not sustained because they the court wasn't going to allow that question to be answered. It was asked. It was answered. She was asked repeatedly about various wrongdoings that she was not. Immunity. I she I don't she was never charged. Was she given immunity? I have no idea. Best pocket immunity was she told I'm not gonna be charges. Get up there and tell us. I don't know that she did. What happened was there was the domestic violence history of domestic violence between Ms. Anderson and Mr. Folston. She started cooperating because she's she was put in the hospital by him. She decided she would start cooperating against Mr. Folston. What time was time to get? I'm sorry. I didn't time to give you a sentence. Mr. Folston or Mr. Ant Allen. He got a hundred and twenty months. How many hundred and twenty months in the government agrees you agree that these go back? Yeah, absolutely. He was sentenced in February 2011. It wasn't what to be else before when he goes back. It was 78. I've got it written down 78 to 97 months was that's a title that well considered under trying to think about. I assume that at that point they would have calculated it based on the guidelines range that had been reduced under the Fair Sentencing Act. So the guidelines would have been applicable at that time, but they were not the judges were not applying the lowered statutory ranges, even though I will note that the government even in the district court in this case asked the court to apply the lower ranges under the Fair Sentencing Act because the government by then had agreed that the ranges in the act should apply. If your honor doesn't have your honors don't have any further questions. The government respectfully requests that you from the district court in this case. Thank you. Thank you. Miss right. Mr. Michael. About the confidentiality of the information in the PSI reports and the sensing memorandums the PSI reports. The same probation officer does everybody basically has the same section for the offense conduct description. That's used for everybody. So it's no big secret and what's in Mr. Allen's offense conduct section probably is what is in all the other people's PSI report. So I'm not too certain why it's okay to show to him afterwards, but not when he's in trial also for over five years. Now the prosecutor's office has been very diligent about protecting the confidentiality of the discovery. It provides and we have to not only be subject to local court orders maintaining confidentiality. We have to actually sign an agreement acknowledging those obligations and following specific procedures to maintain their confidentiality. I can't even give my client a copy of discovery to take back to the pod with them to look at. And quite frankly, that's probably a good idea. I don't believe in group decision making on on discovery back at the pod. This panel doesn't have any power to change the Truvino rule. All we can do is be criticized the way it's applied. So you can't tell us that we ought to change the rule. Can you? We can't overrule another panel. Yes, your honor. But because defense obviously didn't have this information to know of what was going on with the government. It's not just a matter of exculpatory information of one nature, but also of what is the difference between what the probation officer found to be the facts and what they agreed to be the facts. That's important. As to the Folsom transaction, that was an inference based on the quantity that was a distribution quantity. It was an inference that because Folsom was involved with one conspiracy, that this was involved with that conspiracy. It's just inference piled upon inference as to the connection between Mr. Allen and the conspiracy. And this is really industry wide liability, like in the civil case where you got product liability responsibility for everybody in the industry. That's what has been designed for the criminal justice system. And I don't think it's a good system. I don't think it's an accurate system. I don't think that it allows broad brushing of these cases, of going beyond the details, the facts of each transaction, and going into the nature of the transaction, which is, well, this involves crack. He sold crack.  then he's part of the conspiracy. Whether this conspiracy was in one community, or on the other side of this continent, or on the other side of the world, he's liable. I just don't think that's a good system to have. Thank you. Thank you, Mr. Michael. And I noticed that you're court appointed, and we really appreciate your work in this case, and other cases in which you've done the same thing. Thank you. We could not, we couldn't operate without you. Thank you.
judges: Robert B. King, Roger L. Gregory, Barbara Milano Keenan